IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNETTE BROOKINS and DONALD BROOKINS, administrators of the estate of RASHAAD BROOKINS, deceased, | ) ) ) | |
| Plaintiffs, | ) | Civil Action No. 12-1429 |
| | ) | |
| vs. | ) | Magistrate Judge Mitchell |
| | ) | |
| CITY OF PITTSBURGH, et al., | ) | |
| Defendants. | ) | |

I.  Recommendation

It is respectfully recommended that the motion for summary judgment filed on behalf of the defendants (ECF No. 20) be granted with respect to Counts I-II of the Complaint and that Counts III-V be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

II. Report

Plaintiffs, Annette Brookins and Donald Brookins, as administrators of the estate of Rashaad Brookins, bring this civil rights action pursuant to 28 U.S.C. § 1983 and related state law claims, arising out of the events of October 7, 2010, during which City of Pittsburgh police officers Ronald Absten and Kevin Swimkosky shot and killed the Brookins' decedent, Rashaad Brookins. Named as Defendants are the City of Pittsburgh, Absten, Swimkosky and a Pittsburgh police officer identified only as John Doe.

Currently pending before the Court is a motion for summary judgment, filed by the Defendants. For the reasons that follow, the motion should be granted with respect to Counts I-II of the Complaint and Counts III-V should be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

Facts

Defendant Ronald Absten is a City of Pittsburgh Police officer. Defendant Kevin

Swimkosky is also a City of Pittsburgh Police Officer, and has been since he was hired in December, 2001. (Swimkosky Aff. ¶ 1.)[1] Officer Swimkosky indicates that he received substantial education and training on the proper use of force from the City of Pittsburgh Police Training Academy prior to initial deployment. (Swimkosky Aff. ¶ 2.)

In 2004, Officer Swimkosky was assigned to the Zone 5 station, and worked as a patrol officer. (Swimkosky Aff. ¶ 3.) On October 7, 2010, Officer Swimkosky and his partner responded to a burglary in progress at the Frog's Club located at 532 Paulson Avenue, within Zone 5 in the Homewood neighborhood of the City. (Swimkosky Aff. ¶ 4; Investigative report dated 10/7/2010, at 3[2]).

Officer Swimkosky and his partner were the first to arrive on scene and Officer Swimkosky secured the front door while his partner secured the rear of the club. Officer Swimkosky took note that the front door was closed and the frame of the door appeared to be damaged. (Swimkosky Aff. ¶ 5; Investigative report dated 10/7/2010, at 3.)

Officer Absten arrived on the scene as backup, along with his K9 partner, Kuly, a Belgian Malinois. By then, several units formed a perimeter around the club. Officer Absten was informed that the front door had been damaged. (Absten Aff. ¶¶ 1-2;[3] Swimkosky Aff. ¶ 6; Investigative report dated 10/7/2010, at 3.)

Officer Absten asked Officer Swimkosky to assist him in searching the building. (Swimkosky Aff. ¶ 6.) Officer Absten, along with Kuly, approached the front door and gave a

---

[1] Defs.' App. (ECF No. 22) Ex. B. All facts are taken from Defendants' Joint Concise Statement of Material Facts (ECF No. 23), which are supported by the records submitted in the appendix (ECF No. 22). Plaintiffs have not responded to the statements and thus, pursuant to Local Rule 56(E), all facts are deemed admitted.
[2] ECF No. 22 Ex. C.

2

standard K9 warning: "Pittsburgh Police K9, anyone inside talk or I'll release the dog." (Absten Aff. ¶ 3; Swimkosky Aff. ¶ 6.) He gave the warning three times, saying it loudly and clearly each time. (Absten Aff. ¶ 4; Swimkosky Aff. ¶ 7.)

Officer Absten, Officer Swimkosky, and Kuly then entered the building. The building's alarm was ringing and it was very dark. Officer Absten allowed Kuly to search the entire first floor with negative results. (Absten Aff. ¶ 5; Swimkosky Aff. ¶ 8.)

As Officer Absten was about to ascend the stairs to search the second floor, he heard a noise coming from the second floor leading him to believe that someone was up there. (Absten Aff. ¶ 6.) Officer Absten went up the steps to the second floor, where he commanded Kuly to search several of the rooms. Officer Swimkosky provided lighting from the top of the stairwell because the rooms were poorly lit. (Absten Aff. ¶ 7; Swimkosky Aff. ¶ 9.)

Upon hearing another sound in an adjacent room, Officer Absten commanded Kuly to return to him near the top of the steps. (Absten Aff. ¶ 8.) Officer Absten again gave a police K9 warning, and immediately after, Rashaad Brookins ("Brookins") opened a door leading to a kitchen area. Officer Absten then saw Brookins standing in the center of the room. (Absten Aff. ¶ 9.)

Kuly began a "hold and bark" technique while Officer Absten gave commands for Brookins to get on the ground. Brookins refused saying that he "ain't gotta do shit." (Absten Aff. ¶ 10.)

At this point, Officer Swimkosky entered the kitchen area from a different doorway in the rear of the building, also giving orders for Brookins to get on the ground. The area was

---
[3] ECF No. 22 Ex. A.

dark, with little lighting beyond the officers' tactical lights and flashlights. (Absten Aff. ¶ 10; Swimkosky Aff. ¶ 11.)

Brookins never complied with either officer's commands, instead looking towards them with a "crazed look" and appearing agitated by their presence. (Swimkosky Aff. ¶¶ 10, 11.) Kuly, after hearing the orders being yelled by Officer Swimkosky, became distracted and Officer Absten had to hold Kuly by the collar with one hand while holding his service pistol in the other hand. (Absten Aff. ¶ 12.)

Brookins then lunged at Officer Absten aggressively with a fist raised, so Officer Absten struck Brookins in the head with his service pistol, and commanded him to back off. (Absten Aff. ¶ 13; Swimkosky Aff. ¶ 12.) Brookins stumbled back into a door and Officer Absten momentarily lost sight of him. Officer Absten then regained sight of him and both officers commanded Brookins to stay down and to show his hands. (Absten Aff. ¶ 14; Swimkosky Aff. ¶ 13.)

However, Brookins grabbed a sheathed knife from a nearby table, pulled the knife from the sheath, and again quickly approached Officer Absten. Officer Swimkosky then yelled "knife, knife!" (Absten Aff. ¶ 15; Swimkosky Aff. ¶ 14.)

Officer Absten was in fear for his life, as well as Officer Swimkosky's life. Brookins was only a short distance away when he produced the knife and approached them. (Absten Aff. ¶ 16.) When Brookins was approximately two to three feet away, Officer Absten fired two rounds at him using his service pistol. (Absten Aff. ¶ 17; Swimkosky Aff. ¶ 15.)

Brookins collapsed onto the floor, face down, and Officer Swimkosky handcuffed him and attempted to render aid while Officer Absten called for medics and put Kuly back on

lead. (Absten Aff. ¶ 18; Swimkosky Aff. ¶ 16.)

Brookins was pronounced deceased by paramedics on scene. (Absten Aff. ¶ 19; Swimkosky Aff. ¶ 17; Investigative report dated 10/7/2010, at. 3.) Two knives were found under the actor when he was moved by scene investigators. (Initial Report dated 10/7/2010, at 3)[4]

The officers indicate that the situation unfolded rapidly, and there was no doubt in their minds that they were in imminent danger of death or serious bodily injury. (Swimkosky Aff. ¶ 18.) They state that the City of Pittsburgh Police department had trained them to only use deadly force in situations where there is a danger of death or serious bodily harm to the officer or to others. (Swimkosky Aff. ¶ 19.)

Procedural History

Plaintiffs filed this pro se complaint on October 3, 2012. Federal question jurisdiction is asserted over the civil rights claims, 28 U.S.C. § 1331, and supplemental jurisdiction is asserted over the state law claims, 28 U.S.C. § 1367(a). Count I alleges that Defendants Swimkosky, Absten and Doe violated Brookins' Fourth Amendment rights by subjecting him to excessive force which led to his death. Count II seeks to hold the City of Pittsburgh liable for a policy of deliberate indifference to individuals such as Brookins in similar situations and alleges that there is a history of Pittsburgh police officers mishandling these encounters and causing deprivations of constitutional rights. It further alleges that the City failed to train its police officers in the proper use of deadly force. Count III alleges a state law claim of wrongful death, pursuant to 42 Pa. C.S. § 830. Count IV alleges a survival action. Finally, Count V alleges supplemental state law claims of battery, homicide and conspiracy to cover up a crime.

---

[4] ECF No. 22 Ex. D.

After an answer was filed, the Court scheduled an initial Rule 16 Scheduling Conference for April 8, 2013 and mailed a copy of the scheduling order to Plaintiffs at their address of record. On April 8, 2013, Defendants' counsel appeared for the conference, but Plaintiffs did not appear or notify the Court that they were unable to attend. Various scheduling dates were set and a status conference was scheduled for August 21, 2013 (ECF No. 14). On August 12, 2013, the conference was rescheduled for August 27, 2013 (ECF No. 15). On that date, Plaintiffs appeared in person for the conference. They indicated that they would obtain counsel by October 31, 2013 and a status conference was scheduled for November 5, 2013 (ECF No. 18).

However, once again on November 5, 2013, no one appeared for the Plaintiffs and they did not notify the Court that they were unavailable. Defendants indicated that they wished to file a motion for summary judgment and the following schedule was set: the motion was due by December 6, 2013, Plaintiffs' response was due January 3, 2014 and Defendants' reply brief was due by January 17, 2014 (ECF No. 19). Again, a copy of the minute entry was mailed to Plaintiffs at their address of record. On December 6, 2013, Defendants filed their motion for summary judgment, brief in support, concise statement of material facts and appendix (ECF Nos. 20, 21, 22, 23). On January 13, 2014, an order was entered allowing Plaintiffs until January 24, 2014 to respond to the motion and indicating that failure to respond would be construed as consent to the motion being granted (ECF No. 25).

To date, however, Plaintiffs have not filed a response to the motion. Thus, the case could be dismissed for Plaintiffs' failure to prosecute and specifically their failure to respond to orders of this Court. In addition, the motion for summary judgment should be granted based on the undisputed facts of record.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendants argue that: 1) no reasonable jury could conclude that the officers acted unreasonably under the circumstances in using deadly force to respond to an immediate threat posed by Brookins; 2) it is not clear that the officers' conduct was unlawful and therefore qualified immunity applies to preclude suit against them; 3) the City cannot be held liable

because Plaintiffs have not identified a specific policy or practice that was the cause of Brookins' death, including specific additional or different training in the use of deadly force that was "so obvious" and "so likely" as to lead to the alleged violation of Brookins' constitutional rights or a specific supervisory practice that the City failed to employ.

Section 1983 Claims

In Counts I and II, Plaintiffs invoke the civil rights statute to state two claims. It is provided in 42 U.S.C. § 1983 that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). See also Baker, 443 U.S. at 140; Graham v. Connor, 490 U.S. 386, 394 (1989).

However, "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn." Soldal v. Cook County, Illinois, 506 U.S. 56, 70 (1992).

Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. Amend. 4. This provision has been made applicable to the states by the Fourteenth Amendment. Ker v. California, 374 U.S. 23, 30 (1963). The Supreme Court has instructed that "all claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard...." Graham, 490 U.S. at 395. See Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("apprehension by the use of deadly force is a seizure").

The Court of Appeals for the Third Circuit has stated that:

> It is unreasonable for an officer to use deadly force against a suspect unless the officer has good reason "to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 3, 105 S.Ct. 1694. In determining whether this standard was violated, we must remember that law enforcement officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S.Ct. 1865. Thus, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene"; Monday morning quarterbacking is not allowed. Id. at 396, 109 S.Ct. 1865; see also Brown v. United States, 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961 (1921) (Holmes, J.) ("Detached reflection cannot be demanded in the presence of an uplifted knife."). Under this "standard of reasonableness at the moment," Graham, 490 U.S. at 396, 109 S.Ct. 1865, an officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable and the circumstances otherwise justify the use of such force. See id. at 396, 109 S.Ct. 1865; Saucier [v. Katz], 533 U.S. [194,] 205, 121 S.Ct. 2151 [(2001)]; Curley v. Klem, 298 F.3d 271, 280 (3d Cir. 2002).

Lamont v. New Jersey, 637 F.3d 177, 183 (3d Cir. 2011). In Lamont, the court held that state troopers acted reasonably when they responded to a report that a car thief had fled into the dark, thicket-filled woods bordering the interstate, they came upon the suspect and ordered him to

9

show his hands and surrender but he refused and then suddenly pulled his right hand out of his waistband as if he were drawing a gun, and the troopers opened fire, killing him.[5] See also Manigault v. King, 339 F. App'x 229 (3d Cir. 2009), cert. denied, 558 U.S. 1112 (2010) (when officers pursued Manigault into densely wooded yard in darkness and he charged them from a distance of 15 feet with a knife in his hand, the officers' use of deadly force was not unreasonable); Carswell v. Borough of Homestead, 381 F.3d 235, 243-44 (3d Cir. 2004) (officer acted reasonably when he shot man who had escaped from police following multiple incidents of spousal abuse and ran at the officer in a darkened alley at full speed, even though the suspect was unarmed).

In this case, the undisputed evidence of record shows that Brookins hid in a darkened structure, refused to comply with the officers' commands, lunged at Officer Absten with a fist raised and then (after he was struck in the head with a service pistol) quickly approached Officer Absten with the proverbial "uplifted knife." The knife was found under his body, so unlike the troopers in Lamont, Absten and Swimkosky did not make a mistake. Under these circumstances, the officers did not act unreasonably in using deadly force.

Municipal Liability

The Supreme Court has held that:

> [A] local government may not be sued under § 1983 for any injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under § 1983.

---

[5] The court also concluded that, on the other hand, a triable issue remained as to whether the troopers should have continued to fire for 10 seconds after they clearly saw that the suspect had no weapon and the evidence revealed that 11 of the 18 bullets that struck him did so from behind. Id. at 184-85. However, that is not the situation presented by this case.

Monell v. Department of Social Servs. of City of N.Y., 436 U.S. 658, 694 (1978). As Defendants correctly note, Plaintiffs have not cited a policy-making official whose acts may fairly be said to represent official policy. Instead, they merely point vaguely to "other incidents" and contend that the City should be held liable. A plaintiff must demonstrate that the decision-maker, through deliberate conduct, was the "moving force" behind the alleged injury, Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000), and must show an "affirmative link" or "plausible nexus" between the custom or practice and the plaintiff's alleged deprivation of constitutional rights, Bielevicz v. Dubinon, 915 F.2d 845, 850-51 (3d Cir. 1990). Plaintiffs have not done so here and there is no basis for municipal liability.

Failure to Train

Finally, Plaintiffs seek to impose liability on the City based on an alleged failure to train the officers in the use of deadly force. Defendants argue that the record reveals no basis for this claim either.

The Court of Appeals has held that:

> Under 42 U.S.C. § 1983 (" § 1983"), a municipality may be liable for the failure to train its employees only where that failure amounts to "deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); see also Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005). In other words, a municipality can only be liable under § 1983 where the failure to train demonstrates a "deliberate" or "conscious" choice by the municipality. Woloszyn, 396 F.3d at 324 (citing City of Canton, 489 U.S. at 389, 109 S.Ct. 1197). To determine whether a municipality's alleged failure to train its employees amounted to a deliberate or conscious choice, it must be shown that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (citing Walker v. N.Y.C., 974 F.2d 293, 297-98 (2d Cir. 1992)).

> "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury," City of Canton, 489 U.S. at 391, 109 S.Ct. 1197, meaning that the plaintiff must "prove that the deficiency in training actually caused [the constitutional violation at issue]." Id.; see also Woloszyn, 396 F.3d at 325.

Doe v. Luzerne County, 660 F.3d 169, 179-80 (3d Cir. 2011).

In this case, Plaintiffs have not pointed to any record support for their allegation that the City's failure to train Absten and Swimkosky in the use of deadly force amounted to deliberate indifference to Brookins' constitutional rights. Indeed, the record conteains a sworn affidavit stating that they did receive training in the use of deadly force in situations in which there is a danger of death or serious bodily harm to the officer or to others, and that they acted in a rapidly unfolding situation in which they faced this very danger. Based upon the undisputed record, Plaintiffs cannot maintain a claim for failure to train. For these reasons, the motion for summary judgment should be granted with respect to the constitutional claims asserted in Counts I-II.

State Law Claims

The supplemental jurisdiction statute provides that:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Thus, the Court would have supplemental jurisdiction over the state law claims for wrongful death (Count III), survival (Count IV) and battery, homicide and conspiracy to cover up a crime (Count V).

However, Subsection (c) of the supplemental jurisdiction statute provides that a district

court may, in its discretion, decline to exercise jurisdiction if any of four conditions are met. One of these conditions is if "the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). The Court of Appeals has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966) (other citations omitted)). The only possible consideration would be that the statutes of limitations on Plaintiffs' state law claims have expired. However, Congress anticipated this issue and addressed it in the supplemental jurisdiction statute:

> The period of limitations for any claim asserted under section (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d). This section ensures that Plaintiffs' state law claims will not be considered time barred so long as they reassert them in state court within 30 days of the dismissal of this action. Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000).

This Court is unaware of any considerations of judicial economy, convenience, and fairness to the parties that would provide an affirmative justification for maintaining the state law claims, which can be reasserted in state court. Therefore, the state law claims should be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

For these reasons, it is recommended that the motion for summary judgment filed on behalf of the defendants (ECF No. 20) be granted with respect to Counts I-II of the Complaint

and that Counts III-V be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by February 12, 2014. Any party opposing the objections shall file a response by February 26, 2014. Failure to file timely objections will waive the right of appeal.

s/Robert C. Mitchell\
ROBERT C. MITCHELL\
United States Magistrate Judge

Date: January 29, 2014

cc: Annette and Donald Brookins
      Heinz Lofts
      300 Heinz Street, #415
      Pittsburgh, PA 15212
      (by first class and certified mail)